# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 25, 2001

## TERRY STEPHENS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-C-1248     Cheryl Blackburn, Judge**

**Filed December 19, 2001**

**No. M2001-00023-CCA-R3-CO**

---

The petitioner appeals from the trial court's denial of his petition for writ of error coram nobis. In his petition, he alleged that his conviction should be set aside because the victim had recanted his testimony. Following a hearing, the trial court denied relief and the petitioner appealed. After a thorough review, we affirm the court's order of denial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOE G. RILEY, JJ., joined.

Jesse N.H. Bacon, Madison, Tennessee (on appeal), and Lionel R. Barrett, Jr., Nashville, Tennessee (at trial), for the appellant, Terry Stephens.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner was convicted in October 1996 of one count of aggravated rape, a Class A felony, and received a sentence of twenty years, as a Range I, standard offender, in the Tennessee Department of Correction. A panel of this court affirmed the petitioner's conviction and sentence. See State v. Terry Stephens, No. 01C01-9709-CR-00410, 1998 WL 603144 (Tenn. Crim. App. Aug. 24, 1998), perm. to appeal denied (Tenn. Mar. 1, 1999).

On April 27, 1998, the petitioner filed a petition for writ of error coram nobis[1] alleging that the trial testimony of the victim, TDS,[2] the petitioner's son, was false and had been coerced by the victim's uncle and legal guardian at the time of trial, Anthony Michael Battiato. The petition was originally dismissed by the trial court on June 12, 1998. On appeal to this court, the petition was remanded to the trial court for reconsideration in light of State v. Mixon, 983 S.W.2d 661 (Tenn. 1999). An evidentiary hearing was held on January 18, 2000, but the trial court deferred its ruling until the victim's counseling records could be supplied for its review. On December 12, 2000, the court issued its order denying the petition, the order stating that the case had been continued "numerous times" so that the petitioner could furnish the records but that they still had not been received. The counseling records having been received at some point, the court issued a supplemental order on January 11, 2001, stating that the information contained in the victim's counseling records did not support the victim's allegations of coercion or the recanting of his trial testimony, but rather supported his trial testimony. In this appeal, the petitioner argues that the trial court erred in denying his petition.

**DISCUSSION**

The facts upon which the petitioner was convicted are set out in the opinion of this court on the direct appeal of the conviction:

> At the time of the trial, TDS, who was by then fourteen years old, recounted the events of the evening leading to the sexual assault. He stated that his father, the appellant, had received his income tax refund check earlier that day and had gone out drinking with the victim's paternal grandfather, Olin Stephens, Sr. Meanwhile, TDS and his younger brother went to sleep on the living room floor. Sometime later that night, the appellant returned and awoke TDS from his sleep. The victim recalled that, "[h]e asked me to pull my pants down and roll over. He started playing with my private parts . . . with his hands. He pulled his pants down. He put his penis in my butt. It hurt. He said he was sorry he did it because he was drunk." Throughout this entire episode, the victim's younger brother was less than four feet away from the victim. TDS stated that, at the time of this incident, his grandmother (Rosalind Burton Cackley), his step grandfather (Darryl Cackley), his paternal grandfather (Olin Stephens, Sr.), his aunt, and one uncle were also in the house. However, on cross-examination, the victim denied making a

---

[1]The record on appeal was supplemented to include the petition and the affidavit of the victim.

[2]It is the policy of this court to refer to minor victims of sexual abuse by their initials only. Although the purpose of this proceeding is to determine whether the petitioner's son was, in fact, a "victim," we will so refer to him for purposes of clarity.

statement to Sue Ross, infra, that his brother was in a bedroom and that his father was not drunk and did not apologize for this incident afterwards.  TDS told his grandmother of the events the following day.  That same day, the appellant left for Omaha, Nebraska.

On July 22, 1992, Rosalind Cackley took the victim to Our Kids Center, an outpatient clinic that provides medical evaluations for children with allegations of sexual abuse.  Sue Ross, a registered nurse and pediatric nurse practitioner, participated in the examination of TDS. Ms. Ross recalled that the verbal interview of TDS was very difficult, specifically remarking that TDS requested a male interviewer, was "resistive" in some ways, and was not very verbal.  During this interview, the victim informed Ms. Ross that his brother was in a bedroom and that his father was not drunk and did not apologize for this incident afterwards.  Nonetheless, the child did discuss "penile rectal penetration" by his father.  Ms. Ross also performed the genital examination of the victim.  She remarked, "[t]here were no . . . physical findings, any remarkable physical findings at all on the anal genital portion of the exam."  Ms. Ross explained, however, that usually there would not be any physical findings, even twenty-four hours after the alleged abuse occurred, and this incident allegedly occurred months earlier.  Ms. Ross then referred this alleged incident of child abuse to the Davidson County Department of Human Services.

Tammy Burns, a social counselor with DHS, was assigned to investigate the allegation of abuse concerning TDS. Ms. Burns made telephone contact with Rosalind Cackley and arranged to meet with her, the victim, and the victim's brother.  On July 30, 1992, Ms. Burns conducted her interview during which time TDS recounted the incident of February 6, 1992.  Mrs. Burns' testimony, which followed the testimony of Ms. Ross, was objected to by defense counsel upon hearsay grounds.  Her notes of the interview, which were introduced during the State's case in chief, reveal:

> [TDS] said his father anally penetrated him in Nashville at his grandmother's house when she lived on Cahal Street.  He said it happened two days before his birthday, which was February 6, 1992, or 1982.  [TDS] said the night it happened, his father had been drinking alcohol and he remembered that his father had received his income tax check earlier that day.  He said he and his brother had to sleep in the living room because there were so many people there that night.  [TDS] said [his

brother] was asleep on the couch, and he was asleep on the floor. When they went to bed, his father was still out with his friends. He knew his father was planning to leave Nashville the next day; however, his father had not told him where he was going nor when he planned to return. [TDS] said his father woke him up and was talking funny and had alcohol on his breath.

According to [TDS], the lights in the house were off. His father got under the covers with him and took his underwear and pants off. [TDS] said his father told him to take his underwear and pajama bottoms off. When he did, his father told him to turn over. [TDS] said his father then put his penis inside his butt.

[TDS] explained that after his father finished, he told him he was sorry and that he wouldn't have done it if he had not been drunk.

At this point in the interview, [TDS] became emotional and said he didn't want to talk about his father any longer. [TDS] said he did not want to answer any more questions, and that [his younger brother] would have to explain what happened to him because he was finished talking.

At the conclusion of this interview, Tammy Burns contacted the Metro Nashville Police Department, Youth Services Division. Furthermore, as a protective plan, the children were not permitted unsupervised visitation with their father. For the next two years, the children remained in Nashville in the custody of the appellant's mother, Rosalind Cackley.

On May 3, 1994, the Department of Children's Services (formerly DHS) received information that the appellant may have had contact with his children. In response to this referral, Malinda Lundie, a sexual abuse investigator, and Detective Ron Carter, Metro Police, Youth Services Division, traveled to the home of Rosalind Cackley to check on the children's well-being. Although Detective Carter was unable to locate the appellant, arrangements were made for the children to live with Anthony Michael "Mike" Battiato, the appellant's half-brother, who at this time was a resident of Tennessee. Battiato obtained custody of TDS and his younger brother after being appointed their legal guardian. Battiato, his friend Samuel, and the

-4-

two children moved to Omaha, Nebraska in December 1995. This concluded the State's proof.

Stephens, 1998 WL 603144, at *1-2 (footnotes omitted).

## ANALYSIS

The petitioner argues that the trial court erred in denying his petition for writ of error coram nobis which was based on the recanted testimony of the victim.

A writ of error coram nobis is an extraordinary remedy by which the trial court may provide relief from a judgment under narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). The remedy is available by statute to a criminal defendant in Tennessee. See Tenn. Code Ann. § 40-26-105 (1997). This statute provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Id. Recanted testimony may qualify as newly discovered evidence. Mixon, 983 S.W.2d at 672. A new trial should be granted on the basis of newly discovered recanted testimony, however, only if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

Id. at 673 n.17 (citations omitted). The decision to grant or deny a petition for writ of error coram nobis based on newly discovered evidence lies within the sound discretion of the trial court. See Tenn. Code Ann. § 40-26-105 (1997); State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995). As such, we will not overturn the decision of the trial court in this case absent a showing of abuse of discretion.

In this matter, the trial court conducted an evidentiary hearing on the petitioner's claim of recanted testimony at which the victim, TDS; his younger brother, SJS; and the victim's uncle, Thomas Lawrence, testified. The victim's aunt and uncle, Olinda and Thomas Lawrence, became the legal guardians of the victim and SJS after they had run away from Battiato. At the time of the hearing, SJS was living in the Lawrences' home, but the victim had run away and was living with friends in Odessa, Texas.

TDS, who was almost 18 years old at the time of the hearing, stated that, although he testified at trial that the petitioner had sodomized him, the statements were false and made because of coercion from his uncle, Anthony Michael Battiato. Questioned as to why he had lied, he answered: "Because he had threatened me. He said that he would beat me on times if I didn't lie and say what he wanted me to. He told me that he would put me in Boy's Town or foster homes if I didn't tell what he wanted me to say." TDS also stated that Battiato had previously hit him and his brother with "machete cases and boards and stuff like that." TDS further testified that shortly after the trial, he moved to Omaha, Nebraska, with Battiato, who had by then become his legal guardian, and that he was told to keep quiet and not let anyone know that he had testified falsely. He also stated that he was telling the truth now because he missed his dad and wanted him back.

TDS explained that he had made up the allegation of sexual abuse against his father after "watching a movie called My First Name is Steven and it had everyone of them details in the movie . . . ." He testified as to why he had made the initial accusation to his grandmother:

THE COURT:   Okay. Why did you tell your grandmother?

THE WITNESS:  Because she had asked me, and I was mad at my dad at the time for leaving us all of the time. And she asked me while we was watching a movie.

THE COURT:   Okay. So you were mad at your father for leaving, so you told her--this is the day after it happened, correct?

THE WITNESS:  Yes.

THE COURT:   But your dad was there?

THE WITNESS:  Yes.

THE COURT:   So why would you tell your grandmother this?

THE WITNESS:  Because she had asked me, and he wasn't in the house at the time.

-6-

TDS was asked why he had testified falsely at the trial:

THE COURT:   Why did you come in here and lie?

THE WITNESS:  Because I was afraid.

THE COURT:   Afraid of whom?

THE WITNESS:  I was afraid – at first I was mad at him for leaving all of the time. I just wanted him to stay with us instead of leaving and going to different states all of the time.

THE COURT:   So how would telling this lie accomplish something? What did you think you were going to accomplish?

THE WITNESS:  I don't know.

THE COURT:   Why did you tell the Lawrences that this was a lie?

THE WITNESS:  Because I wanted my dad back, and I felt bad for lying about it.

TDS admitted that Battiato was not present the day he told his grandmother about the incident. He further testified that Battiato had not been spoken of favorably in the Lawrence household where he lived after running away from Battiato in Nebraska. When asked why he had run away from Battiato and come to the Lawrences' home in Nashville, he said that he was uncomfortable living with Battiato because Battiato had beaten and abused him. He testified that the Lawrences were the first persons to whom he had admitted that he had lied at trial and that he had asked them to take him to see the petitioner in jail.

On direct examination, Thomas Lawrence testified that after TDS had moved back to Nashville to live with his family, he admitted that he had lied about the incident. When asked about the circumstances under which TDS had told them, Lawrence stated that following a visit to the petitioner in jail, TDS reacted as follows:

A. Oh, okay. I'm sorry. All right. [TDS] approached me and told me that he had felt bad about his dad being in jail. I understood what he was saying, that is what I was trying to lead to. I understood what brought it to that point.

[TDS] told me that he had lied because he was scared that [Battiato] was going to do something to him. I said, what do you mean, son? He said, he threatened to put me in a boy's home. He

-7-

threatened to take us away and drop us off. He threatened even to kill us. I said, well, he can't hurt you now. We have custody of you. He cannot touch you here.

Then he started crying and he told me about some things that he had been scared of down there, about [Battiato's] – well, I want to call him his boyfriend, but they are married. Well, [Battiato's] he/she or whatever you call it had done to [TDS] and them, intimidated them.

Q. Where was this conversation taking place? Was this in your home?

A. In my home, yes. He was in the safety of my home so I felt like that he was telling me things that he could tell me without pretension from anybody or anything else. I said, well, [TDS], I never have asked you anything about what all went on because I didn't want to put you on the spot. I didn't want to make the kid feel like he was coerced into something. I wanted him to be truthful and I wanted it to be from him.

Then he proceeded to tell me that his dad never done anything to him. That he had gotten mad at his dad because his dad had left him, and he started crying. These kids never had a mother. Their mother dropped them off, so his dad was all he had. Then, when his dad dropped him off and left him, I guess they felt like they were abandoned; that is what he told me.

Mr. Lawrence then testified that, in April 1998, he took TDS to trial counsel's office where TDS gave an affidavit recanting his trial testimony. Lawrence said that TDS was "very honest" when he lived with the Lawrence family and that he had taken TDS to several counseling sessions.

TDS's younger brother, SJS, testified that he was present when Battiato had threatened TDS in Omaha, Nebraska. He also testified that he had been physically abused by Battiato "[j]ust about everyday" and was afraid of Battiato. SJS stated that TDS had confided in him about his false testimony two days after they returned to Nebraska following the trial. He also recalled talking to the Lawrences about it when he went to live with them in Nashville.

At the conclusion of the evidentiary hearing, the trial court issued an extensive and detailed written order in which it analyzed the newly discovered evidence in light of the three criteria enunciated in Mixon for determining when a new trial should be granted based on newly discovered recanted testimony.

In its order denying the petition, the post-conviction court stated:

> Under criteria (1), it is not enough simply to submit a sworn affidavit from the Victim contradicting his previous sworn testimony, subjected to extensive direct and cross-examination in court, to reasonably well satisfy this Court that the testimony given at trial by the Victim as witness was false. Victim's affidavit and testimony at the hearing on this petition asserts that his uncle and guardian, Anthony Michael Battiato, coerced Victim in testifying against Victim's father at the trial conducted on October 10, 1996, and that if Victim did not testify as directed by his uncle, the uncle would send him to live in a foster home.

> However, Victim's affidavit is not the only material evidence of the offense committed. Taken from Stephens at *1-2, there is the prior evidence that Victim had spoken to his grandmother, without Mr. Battiato present, about sexual abuse by Petitioner leading to the charges upon which Petitioner was ultimately convicted. On July 22, 1992, Victim's grandmother took Victim to Our Kids Center, an outpatient clinic that provides medical evaluations for children with allegations of sexual abuse. Sue Ross, a registered nurse and pediatric nurse practitioner, participated in the examination of Victim. Ms. Ross recalled that the verbal interview of Victim was very difficult, specifically remarking that Victim requested a male interviewer, was "resistive" in some ways, and was not very verbal. During this interview, Victim informed Ms. Ross that his brother was in a bedroom and that his father was not drunk and did not apologize for this incident afterwards. Nonetheless, the child did discuss "penile rectal penetration" by his father. Ms. Ross also performed the genital examination of the Victim. She remarked, "[t]here were no . . . physical findings, any remarkable physical findings at all on the anal genital portion of the exam." Ms. Ross explained, however, that usually there would not be any physical findings, even twenty-four hours after the alleged abuse occurred, and this incident allegedly occurred months earlier. Ms. Ross then referred this alleged incident of child abuse to the Davidson County Department of Human Services (DHS).

> Tammy Burns, a social counselor with DHS, was assigned to investigate the allegation of abuse concerning Victim. Ms. Burns made telephone contact with Victim's grandmother and arranged to meet with her, Victim, and Victim's brother. On July 30, 1992, Ms. Burns conducted her interview during which time Victim recounted

the incident of February 6, 1992. Her notes of the interview, which were introduced during the State's case-in-chief, reveal that Victim said that his father anally penetrated him in Nashville at his grandmother's house when she lived on Cahal Street. He said it happened two days before his birthday, which was February 6, 1992, or 1982. Victim said the night it happened, his father had been drinking alcohol and he remembered that his father had received his income tax check earlier that day. He said he and his brother had to sleep in the living room because there were so many people there that night. Victim said that his brother was asleep on the couch, and he was asleep on the floor. When they went to bed, his father was still out with his friends. He knew his father was planning to leave Nashville the next day; however, his father had not told him where he was going nor when he planned to return. Victim said his father woke him up and was talking funny and had alcohol on his breath.

According to Victim, the lights in the house were off. His father got under the covers with him and took his underwear and pants off. Victim said his father told him to take his underwear and pajama bottoms off. When he did, his father told him to turn over. Victim said his father then put his penis inside his butt. Victim explained that after his father finished, he told him he was sorry and that he wouldn't have done it if he had not been drunk.

At this point in the interview, Victim became emotional and said he didn't want to talk about his father any longer. Victim said he did not want to answer any more questions, and that his younger brother would have to explain what happened to him because he was finished talking.

None of this material testimony of the Petitioner's criminal conduct, essentially recounting Victim's testimony at trial alleged coerced by Mr. Battiato, is affected by Victim's affidavit. Mr. Battiato did not obtain legal custody of Victim until December 1995 and hence could not have influenced Victim to communicate as he did prior to that date. That he allegedly did so after obtaining custody and prior to Petitioner's trial has no effect on this other material testimony.

Under criteria (2), the defendant is required to be reasonably diligent in discovering the new testimony, or was surprised by the false testimony, or was unable to know the falsity of the testimony until after the trial. The record indicates that defense counsel

introduced testimony, through Petitioner's own testimony in court at trial, of Anthony Michael Battiato's alleged efforts to coerce Petitioner prior to trial. Therefore, there is nothing surprising about an additional allegation of Mr. Battiato's alleged similar coercion of Victim prior to trial. Because Petitioner, through counsel, had reasonable knowledge of Mr. Battiato's alleged coercion of Petitioner enough to put such information before the jury at trial, it stands to reason that reasonable diligence would have yielded similar knowledge in regards to similar coercion of Victim if such information existed. In any event, what evidence of alleged coercion by Mr. Battiato was introduced was apparently discounted by the jury, who returned a verdict of guilty. Stephens, 1998 WL 603144 at *3.

Under criteria (3), a new trial must be granted because of newly discovered recanted testimony if the jury might have reached a different conclusion had the truth had [sic] been told. It would be one thing had Victim's testimony at trial been the only material evidence offered or introduced of Petitioner's criminal conduct. However, Victim's testimony was not the only material testimony introduced at trial, and earlier testimony of Mr. Battiato's similar alleged coercion was apparently discounted by the jury. With the amount of evidence brought to bear on the matter of Petitioner's criminal culpability, to grant a motion for a new trial on the basis of Victim's affidavit alone would be tantamount to second-guessing the jury.

Therefore, since the affidavit of the Victim included as evidence with Petitioner's petition for writ of *error coram nobis* is not evidentially sufficient to meet the criteria for granting a motion for a new trial on the basis of newly discovered recanted testimony in accordance with Mixon, Petitioner's motion is hereby DENIED.

After the initial order was issued, the trial court received and reviewed the counseling records of the victim. In a supplemental order,[3] filed on January 11, 2001, the court stated:

This Court has reviewed these records and, after due consideration, determines that the information contained therein does

---

[3]The notice of appeal in this matter was filed on December 26, 2000; and the trial court no longer had jurisdiction after that date. State v. Peak, 823 S.W.2d 228, 229 (Tenn. Crim. App. 1991). Accordingly, the supplemental order of January 11, 2001, was a nullity. Since that order merely affirmed the trial court's order of December 12, 2000, denying the petition, the supplemental order does not affect our conclusions.

-11-

not support the allegation of coercion of the Victim or the subsequent recanting of trial testimony of the Victim, but instead supports the Victim's trial testimony. These records do not alter the Court's ruling that the evidence is not sufficient to meet the criteria for granting of a motion for a new trial on the basis of newly discovered recanted testimony in accordance with State v. Mixon, 983 S.W.2d 661 (Tenn. 1999).

We will review the determination of the trial court, utilizing an abuse of discretion standard.

It is implicit in the ruling of the trial court that the victim's recantation of the rape by his father was not believed. We note that, at the time the victim testified at trial that the rape occurred, he was living with his grandmother. He said that he told her of the incident the day after it had occurred. Subsequently, he told Sue Ross, a registered nurse and pediatric nurse practitioner at Our Kids Center, of the "penile rectal penetration" by his father, as well as relating the incident to Tammy Burns, a social counselor with the Tennessee Department of Human Services. As the trial court noted, and the trial testimony shows, Anthony Michael Battiato, who is alleged to have coerced the victim into making the false statements, did not obtain legal custody of him until December 1995, approximately three and one-half years after the statements were made. There is no proof that Battiato was present when the victim told his grandmother, Ross, or Burns of the incident. These circumstances provide additional support to the trial court's conclusion that the victim was untruthful when he recanted his trial testimony.

As for the defendant's degree of diligence in discovering the new testimony, the trial court noted that at trial the petitioner, himself, testified as to the efforts of Anthony Michael Battiato to coerce him into relinquishing his parental rights of the victim. From our review of the trial record, we note that, additionally, Olinda Stephens, the petitioner's sister, testified at the trial that she was present when Battiato told the petitioner that the criminal charges would be dropped if the petitioner would give Battiato "full custody of the boys." Additionally, Thomas Lawrence, who was acquainted with both Battiato and the petitioner, testified at the trial that several years prior to the trial, he observed Battiato shaking the victim and saying to him, "[Y]ou do what I tell you to do and I'll get you the new bicycle I told you I would get you, but I ain't getting you a damn thing if you don't do what I said."

Thus, even at the time of trial, defense counsel was aware of the alleged coercion of the victim by Battiato, resulting in the victim's claim of rape. Approximately a year and a half after the trial, the victim contacted trial defense counsel to claim that his trial testimony had been false. Given the chronology and the victim's explanation for the change of testimony, it is difficult to conclude that counsel's diligence, or lack thereof, is relevant. Likewise, it is difficult to assess the effect the victim's recantation would have had on the jury.

In this matter, the pivotal consideration appears to be whether the victim's untruthfulness occurred at the trial or at the coram nobis hearing. Since the same trial court presided at both, it had

a unique opportunity to determine, to the extent that it is possible to know when another person is being untruthful, at which occasion the victim testified falsely. See Mendiola v. Schomig, 224 F.3d 589, 593 (7th Cir. 2000) (trial judge heard witness's trial testimony "which supplied ample basis for the judge to disbelieve a later inconsistent story"), cert. denied, __ U.S. __, 121 S. Ct. 2591, 150 L. Ed. 2d 750 (2001).  Applying the dictates of Mixon, the court determined that the false testimony occurred at the hearing, and based upon our review of the entire record, including the trial transcript, we cannot say that the court abused its discretion in so concluding.  Accordingly, we affirm the order of the trial court denying the petition for writ of error coram nobis.[4]

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

---

[4]Although it is not the basis for our determination in this matter, we note that courts are skeptical of recantations in sexual abuse cases involving children for, in such cases, "recantation is a recurring phenomenon." United States v. Provost, 969 F.2d 617, 621 (8th Cir. 1992) (citations omitted).